IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| DREYMOOR FERTILIZERS OVERSEAS PTE. LTD. a Singapore entity, | ) ) ) |
| Petitioner/Judgment Creditor, | ) ) |
| vs. | ) Case No. 6:20-mc-00105-EFM ) |
| AVAGRO, LLC, a Kansas limited liability company, and UAB AVAGRO, a Lithuanian corporation, | ) ) ) ) |
| Respondents/Judgment Debtors. | ) ) ) |

**EMERGENCY MOTION FOR SANCTIONS AND/OR ORDER OF CONTEMPT**

**I.      INTRODUCTION**

This Court is well aware of the short, difficult history of this simple enforcement action. The obstreperous approach of both AVAgro LLC and UAB AVAgro (collectively "AVAgro") to even the simplest issues has been designed to hinder and delay enforcement of the judgment in favor of Dreymoor for approximately $7 million in this action and in the related Lithuanian action. That approach has forced Dreymoor to make multiple applications to this Court, which have resulted in an injunction freezing the world-wide assets of AVAgro, an order requiring full disclosure of all assets of AVAgro and, ultimately, multiple Garnishment Orders against those disclosed assets.

The owner of AVAgro, Anna Mikhailova, has now consciously and intentionally violated those orders by demanding payment from one of the garnishees directly to AVAgro, bypassing Dreymoor, without Dreymoor's knowledge or consent, presumably hoping to recover those funds for her own personal use outside of the enforcement action. Thereby, Ms. Mikhailova has both ignored the injunction freezing all assets, and actively undermined the Garnishment Order by demanding that the garnishee ignore its obligations under the order and pay AVAgro directly.

1

Ms. Mikhailova's actions are disdainful of this Court's authority, contemptuous of this Court's order and should be subject to sanctions and/or a finding of contempt. The only appropriate sanction that would both directly penalize Ms. Mikhailova's actions and reasonably protect Dreymoor's recovery from that garnishee is an Order from this Court transferring ownership of the underlying receivable from AVAgro to Dreymoor with the amount recovered by Dreymoor, net of its collection costs, being credited against the amount due from AVAgro. In fact, this will have the exact same result as the garnishment order already entered; namely requiring that the amount due on this receivable is paid to Dreymoor and not improperly diverted by AVAgro or Ms. Mikhailova.

Transferring ownership will allow Dreymoor to negotiate directly with the garnishee, the Ukrainian company Shakur LLC ("Shakur"), who has agreed to work with Dreymoor to reach a settlement of the debt, but only with assurances that Shakur will not be subject to any action by AVAgro in Ukraine. The sanction is appropriate to Ms. Mikhailova's actions, narrowly tailored to the subject matter of her contempt and is necessary to protect Dreymoor's interests and the integrity of the legal process. The nature of the contempt and the possible dissipation of assets requires that this notion be heard on an emergency basis.

Dreymoor's counsel advised opposing counsel, prior to filing this motion, that the Court will be hearing this emergency motion by phone sometime between 9:00 a.m. and 3:00 p.m. tomorrow, July 30, 2020.

## II. FACTUAL BACKGROUND

At the request of Dreymoor, this Court entered an order confirming the arbitration award in the matter of *UAB AVAgro v. Dreymoor Fertilizers Overseas PTE LTD.*, International Centre For Dispute Resolution International Arbitration Rules and Procedures, Case No. 01-19-0000-3381 (the "Award") on May 22, 2020. The award was valued at EUR 6,211,091.06 plus USD 339,761.42. (Declaration of Alexander Shishkin ("Shishkin Decl.") at ¶ 2.) That same day, this Court entered an injunction prohibiting AVAgro from selling, transferring, pledging or otherwise disposing of assets owned by them, directly or indirectly, beneficially or of record, in whole or in

part unless and until the amount due Dreymoor on the Judgment, including all interest thereon, has been paid in full. The Court also ordered AVAgro to disclose all of their assets within five days. (Shishkin Decl. at ¶ 3.)

On May 27, 2020, AVAgro provided a list of various assets, including a receivable allegedly owed to it by a Ukrainian company, Shakur LLC ("Shakur"). Pursuant to a "Set-off Agreement" dated June 15, 2019 among LLC, UAB and Shakur, $766,614.52 was owed by Shakur to AVAgro. Thereafter, Dreymoor sought an order of garnishment against Shakur as the garnishee for that amount, and that Garnishment Order was granted by the Court on June 10, 2020. (Shishkin Decl. at ¶ 4.) After this Court issued the garnishment order against the debt owed by Shakur UAB, the order was sent to Shakur on June 15, 2020. In reply, Shakur stated it was concerned about following an order from a foreign court and making payment to Dreymoor without agreement from AVAgro that the debt must be paid to Dreymoor. (Shishkin Decl. at ¶ 5.)

Dreymoor has since had several discussions with Shakur about payment of the debt to Dreymoor under the garnishment order, but Shakur continues to be reluctant to make that payment without some assurance that AVAgro would not somehow pursue claims against Shakur in Lithuania or Ukraine if Shakur complied with the garnishment order. (Shishkin Decl. at ¶ 6.) Dreymoor has tried repeatedly to gain AVAgro's cooperation in that regard, whether by written agreement, assignment of the debt, or other reasonable approaches, but AVAgro has refused to cooperate. (Shishkin Decl. at ¶ 6.)

Several days ago, Dreymoor learned for the first time that the owner of AVAgro, Anna Mikhailova, had contacted Shakur and demanded it not honor the garnishment order but rather pay AVAgro the amount due. (Declaration of Taras Ivashchenko ("Ivashchenko Decl.") at ¶¶ 2-4); see also (Shishkin Decl. at ¶¶ 6-7.)

On July 28, 2020, Taras Ivashchenko, a representative of Dreymoor, met with Dmitry Volkodav, the owner of Shakur, in Ukraine to discuss payment of the debt owed. (Ivashchenko Decl. at ¶ 2.) Shakur was aware of the Garnishment Order because it had been sent to them under cover letter from Dreymoor on June 15, 2020. (Ivashchenko Decl. at ¶ 3.) While he disagreed with the amount that AVAgro claims is owed, he acknowledged that Shakur does have an outstanding debt to AVAgro. (Ivashchenko Decl. at ¶ 3.)

Mr. Volkodav told Mr. Ivashchenko that he had received a phone call from Ms. Mikhailova on July 27, 2020, demanding that Shakur make payment directly to AVAgro and not to Dreymoor as required by the Garnishment Order. (Ivashchenko Decl. at ¶ 4); see also (Shishkin Decl. at ¶ 7.) He told me that Ms. Mikhailova then sent a letter to Shakur demanding that it provide her any information and/or documents that Shakur had given to Dreymoor. (Ivashchenko Decl. at ¶ 5.)

In response, Mr. Volkodav suggested that Ms. Mikhailova send him a letter – with a copy to Dreymoor – stating the amount of the debt she claimed was owed. He also asked that the letter authorize Shakur to copy Dreymoor on any future correspondence and authorize Shakur to discuss with Dreymoor all payment issues. (Ivashchenko Decl. at ¶ 6.) He further told Ms. Mikhailova that upon receipt of the above letter, Shakur would send to AVAgro and Dreymoor confirmation of the undisputed amount of the debt owing and a proposed payment schedule. If the schedule was approved by Dreymoor, Shakur would make payments accordingly. To date, Ms. Mikhailova has not provided any such letter and Shakur has not made any payments. (Ivashchenko Decl. at ¶ 7.) Shakur has nonetheless continued to express a willingness to work with Mr. Ivashchenko to resolve the debt, if AVAgro authorizes him to do so. (Ivashchenko Decl. at ¶¶ 7-8.)

That demand by Ms. Mikhailova occurred in the context of what Dreymoor believed were discussions between their U.S. counsel to come to an agreement on an efficient method by which to collect the Shakur debt. It had always been Dreymoor's intention to come to a reasonable agreement with AVAgro and Ms. Mikhailova to recover the assets that were

4

disclosed on their asset list, without having to resort to repeated enforcement proceedings with this Court. That, of course, included the Shakur receivable, as well as the UAN that is still unsold in storage in Lithuania (which were the two primary assets disclosed) as well as what AVAgro represented were various "demurrage charges" worth approximately $180,000 and various smaller receivables. (Shishkin Decl. at ¶ 9.)

Even by AVAgro's generous valuations, those assets collectively were worth much less than the outstanding judgment due Dreymoor. Because of the large disparity in value between the amount owing and the purported assets of AVAgro, it made sense to try to quickly resolve the collection of those assets. To that end, Dreymoor has made numerous offers to AVAgro and Ms. Mikhailova to try to come to an agreement on the most efficient way to proceed in recovering the value of those assets, but all of those proposals have been rejected by AVAgro and Ms. Mikhailova for no valid reason. (Shishkin Decl. at ¶ 10.)

Thus, Dreymoor has had to repeatedly turn to this Court for various orders by which to execute against the assets, including multiple garnishment orders like the one against Shakur. After the Garnishment Order was issued and sent by email to Shakur, Dreymoor again proposed a resolution to AVAgro whereby AVAgro would assign its claims against Shakur to Dreymoor and Dreymoor would pursue them at its own expense, giving AVAgro full credit for any net recovery. (Shishkin Decl. at ¶ 11.)

AVAgro rejected this proposal, claiming that AVAgro believed Shakur was transferring assets to avoid collection, and that AVAgro wanted to proceed quickly with collection efforts in the Ukraine, which it proposed it would handle through its counsel at Dreymoor's expense, seeking preliminary relief against Shakur. (See Exhibit 1 to the Shishkin Decl. at ¶ 11.)

Following that exchange, on July 20, 2020, in a phone conversation between our U.S. counsel, Patrick Salisbury, and the U.S. counsel for AVAgro, Patrick Hughes, Mr. Salisbury suggested that Dreymoor would fund counsel of Dreymoor's choosing to pursue the claims against Shakur in Ukraine, with full setoff to AVAgro of anything collected on a net basis against the debt owed by AVAgro. (Shishkin Decl. at ¶ 12.)

5

Dreymoor also agreed to give AVAgro a setoff of the full amount owing by Shakur, on a net basis, if Dreymoor decided they wanted to compromise the claim for less than the full amount. In other words, AVAgro would have no cost, no risk, and would be credited the full amount of the Shakur debt on a net basis, regardless of any settlement amount. (Shishkin Decl. at ¶ 12.) Mr. Hughes initially agreed with the approach, and a letter from Mr. Salisbury outlining the terms of the proposal was sent by email on July 21, 2020. (See Exhibit 2 to the Shishkin Decl. at ¶ 12.)

The next day, Mr. Hughes requested the details of the counsel Dreymoor proposed to retain and that same day Mr. Salisbury provided the details of the counsel Dreymoor proposed to retain two highly respected Ukrainian lawyers, Myroslav Hnatiuk and Oleg Valendyuk – the former General Prosecutor of Kiev – to handle the Shakur receivable collection at Dreymoor's expense. (See Exhibit 3 to the Shishkin Decl. at ¶ 12.)

Having received no response from Mr. Hughes, Mr. Salisbury followed up by email on July 27, 2020, reminding him of the supposed "urgency" outlined in AVAgro's earlier response. Mr. Hughes then responded that same day:

> "AVAgro LLC is awaiting feedback from its Ukrainian counsel, who are on holiday through Wednesday. The urgency that existed when AVAgro first requested Dreymoor make funds available to initiate the litigation is somewhat reduced at this point. As we understand it, Shakur is not disposing of its fixed assets (such as agricultural equipment and fertilizer storage facilities), but has now sold this year's harvest and used proceeds to buy fall fertilizers (which AVAgro LLC wanted to avoid) instead of paying AVAgro LLC. Thus, the only way to get paid from Shakur now is to arrest Shakur's fixed assets and bank accounts. AVAgro LLC needs to consult with its Ukrainian legal counsel to ensure that any arrangement with Dreymoor along the line of the latest proposal would be structured to assure that it does not jeopardize collection efforts in a way that Ukrainian counsel would be uniquely situated to advise." (See Exhibit 4 to the Shishkin Decl. at ¶ 13.)

6

It was the next day that Mr. Ivashchenko met with Mr. Volkodav to discuss Shakur's debt, and Dreymoor first learned that Ms. Mikhailova had demanded payment from Shakur directly to AVAgro, despite this Court's orders. Dreymoor has not had any further response from AVAgro or from Mr. Hughes.

## III. LEGAL ANALYSIS

### A. This Motion Should Be Heard on an Emergency Basis

Dreymoor recognizes that a motion seeking sanctions and/or contempt is a very serious motion and requires that Ms. Mikhailova and AVAgro be given a reasonable opportunity to file an opposition. For that reason, the sanction Dreymoor seeks is focused directly on the sanctionable behavior at issue and is not on monetary sanctions which would require a more burdensome and time-consuming evidentiary showing and opposition. The Court is, of course, empowered to impose any additional sanctions it deems reasonable, *sua sponte*, which clearly could include a monetary sanction (whether via an Order to Show Cause or otherwise). *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42 n.8 (1991); *see also* that the Court may impose sanctions "[o]n motion or on its own".

For obvious reasons, Dreymoor is very concerned that Ms. Mikhailova and AVAgro have been, and will continue, to flout this Court's orders and work to recover any assets outside of this proceeding, for their own benefit and at the expense of Dreymoor. This fact alone demonstrates the urgency of this Motion. Already, in addition to the attempt to direct payment by Shakur directly to AVAgro, one of the largest other listed assets – receivables of approximately $180,000 for various demurrage charges, has disappeared. When pressed for details, AVAgro eventually said that none of these receivables were documented and it did not actually have any demurrage receivables. (See Exhibit 5 to Shishkin Decl. at ¶ 15.) This may well be another case of Ms. Mikhailova secreting assets and attempting to collect them separately for her own benefit as she is now doing with Shakur. Either way, emergency action is necessary.

### B. This Court has Inherent Authority to Sanction both Ms. Mikhailova and AVAgro

The behavior at issue here is not behavior specifically addressed by any of the typical sanctions statutes: Rule 11 has no applicability because this behavior does not involved a signed pleading; Rule 16 is not applicable because the order at issue is not a scheduling order; Rule 37 is not applicable because the issue does not involve discovery and 28 U.S.C. § 1927 is not applicable because the issue is not one of hindering or delaying the action itself. But this Court nonetheless has the inherent power to control the actions of the parties before it, and that inherent power is a sufficient basis for the imposition of the sanction sought by Dreymoor and/or a finding of contempt, in either case coupled with an order transferring the ownership of the Shakur receivable to Dreymoor. "[D]istrict courts have the inherent power" to sanction a party "for bad faith conduct violating the court's orders even if procedural rules exist which sanction the same conduct." *S. New England Tel. v. Global NAPs Inc.*, 624 F.3d 123, 144 (internal quotation marks omitted); see also *NASCO*, 501 U.S. at 50 ("[N]either is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules.").

"It has long been understood that 'certain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *NASCO*, 501 U.S. at 43-44 (quoting *United States v. Hudson*, 11 U.S. 32, 34 (1812)); see also *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) (citing *Hudson*). Therefore, "'Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Anderson v. Dunn*, 19 U.S. 204, 227 (1821); *see also Ex parte Robinson*, 86 U.S. 505, 510 (1874). These inherent powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631 (1962).

8

As the Supreme Court explained in *NASCO*, many "prior cases have outlined the scope of the inherent power of the federal courts. For example, the Court has held that a federal court has the power to control admission to its bar and to discipline attorneys who appear before it. *See Ex parte Burr*, 22 U.S. 529, 531(1824). While this power "ought to be exercised with great caution," it is nevertheless "incidental to all Courts." *Id*. The Supreme Court in *NASCO* went even further: "In addition, it is firmly established that 'the power to punish for contempts is inherent in all courts.'" *Id.* (citing *Robinson*, 86 U.S. at 510). "This power reaches both conduct before the court and that beyond the court's confines, for 'the underlying concern that gave rise to the contempt power was not . . . merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial.'" *Young v. United States ex rel. Vuitton et Fils S. A.*, 481 U.S. 787, 798 (1987) (citations omitted). That same reasoning applies to Ms. Mikhailova's and AVAgro's contempt here.

While it was outside of the confines of the courtroom, it was clearly a direct and intentional disregard of the Court's injunction and a direct and intentional attempt to interfere with Shakur's compliance with the Garnishment Order. Ms. Mikhailova should not now be heard that she somehow intended to pay any monies obtained to Dreymoor, because AVAgro's assets were frozen, meaning neither she nor AVAgro had any right to take any action "transferring, pledging or otherwise disposing of assets owned by them, directly or indirectly, beneficially or of record, in whole or in part." Her attempt to demand payment directly to AVAgro from Shakur was an attempted disposition of assets in contravention of the injunction, as evidenced by the fact that she was negotiating with Dreymoor on how best to proceed against the Shakur receivable at the very same time she was attempting to negotiate directly with Shakur, a fact which she never disclosed in her negotiations with Dreymoor. Had her intentions been innocent, she would have disclosed to Dreymoor that she was also negotiating for payment from Shakur, and assured Dreymoor that any payment would go directly from Shakur to Dreymoor. She did not so disclose because that was not her intention.

9

Her demand for payment from Shakur directly to AVAgro is also a direct attempt to undermine the Court's Garnishment Order. She was well aware that the Garnishment Order required Shakur to pay any monies directly to Dreymoor, not to AVAgro. By "demanding" that Shakur pay AVAgro directly, she is not only demanding payment of money to which she knew AVAgro was no longer entitled, but also demanding that Shakur ignore the lawful order of this Court. Whether or not Shakur, as a Ukrainian company, was bound by the order at that stage, Ms. Mikhailova, a Kansas citizen, and AVAgro LLC (the owner of the receivable), also a Kansas citizen, were certainly both bound by the Garnishment Order and Ms. Mikhailova's attempts to circumvent it were in contempt of that order.

With that in mind, this Court has the inherent power to impose an appropriate sanction against Ms. Mikhailova and AVAgro. The sanction sought here is intended to be narrowly tailored to the specific actions taken by Ms. Mikhailova regarding the Shakur receivable. By virtue of the Garnishment Order, Dreymoor is already entitled to payment of that receivable. Because of Ms. Mikhailova's interference, Dreymoor's ability to recover that receivable from Shakur has been impacted. Shakur has now indicated that it will only pay the receivable if it is protected from legal action against it by AVAgro. If this Court orders that ownership of that receivable, Shakur can negotiate with Dreymoor without concern about an action brought against it by AVAgro. Thus, not only is the sanction appropriately narrow, it is also well within the inherent power of the Court to manage the parties before it, both of whom are Kansas citizens. Moreover, the receivable at issue is owned by LLC, a Kansas entity and therefore is by definition located in Kansas. *Vision Marketing Resources, Inc. v. McMillion Group, LLC et al.*, Case No. 10-2252 (D. Kan.), Report and Recommendation Notice, ECF No. 62, May 8, 2015, fn. 13 (citing Carter G. Bishop, *LLC Charging Orders: A Jurisdictional & Governing Law Quagmire*, 12 No. 3 BUSENT 14, 21 (May/June 2010) (arguing that "[b]ecause an LLC membership interest is intangible personal property, it must be 'located' somewhere, and the proper location is the state whose LLC act created the entity (thereby giving rise to the interest)")).

10

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *NASCO*, 501 U.S. at 44-45 (citing *Roadway Express*, 447 U.S. at 764).

> A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process. As we recognized in Roadway Express, outright dismissal of a lawsuit, which we had upheld in Link, is a particularly severe sanction, yet is within the court's discretion. Consequently, the "less severe sanction" of an assessment of attorney's fees is undoubtedly within a court's inherent power as well. Ibid.

*NASCO*, 501 U.S. at 44-45.

That same reasoning applies here. The mild sanction sought by Dreymoor would only serve to give Dreymoor a direct route to the collection of an asset that has already been garnished, the debt of which is not in dispute, and that would very likely already have been paid with full credit to the judgment against AVAgro, but for Ms. Mikhailova's interference. It is much less of a "particularly severe sanction" that might be otherwise ordered, and "undoubtedly falls within a court's inherent power…."

## IV. CONCLUSION

For all the foregoing reasons, Dreymoor respectfully requests that this Court sanction Ms. Mikhailova and AVAgro by transferring ownership of the Shakur receivable from AVAgro LLC to Dreymoor with the amount recovered by Dreymoor, net of its collection costs, being credited against the amount due from AVAgro.

CORE/3519744.0002/160741421.1

Dated: July 29, 2020

                        Respectfully submitted,

                        */s/ Lynn D. Preheim*
Lynn D. Preheim, SCt. #13300
Anna C. Ritchie, SCt. #24934
STINSON LLP
1625 N. Waterfront Parkway, Suite 300
Wichita, KS 67206-6620
Phone: (316) 268-7930
Fax: (316) 265-1349
lynn.preheim@stinson.com
anna.ritchie@stinson.com

and

Lawrence Salisbury, NY Bar #179748
 (entered *pro hac vice*)
Patrick Salisbury, NY Bar #2547644
 (entered *pro hac vice*)
SALISBURY & RYAN LLP
1345 Avenue of the Americas, 2nd Floor
New York, New York 10105
Phone: (212) 977-4660
Fax:  (212) 977-4668
ls@salisburyryan.com
ps@salisburyryan.com

*Attorneys for Petitioner Dreymoor Fertilizers Overseas Pte. Ltd.*

## CERTIFICATE OF SERVICE

      I hereby certify that on this 29th day of July, 2020, I caused the above and foregoing be electronically filed with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Patrick B. Hughes
Adams Jones Law Firm PA
1635 N. Waterfront Pkwy., Suite 200
Wichita, KS 67206
phughes@adamsjones.com
*Attorney for Respondents*

                        */s/ Lynn D. Preheim*
Lynn D. Preheim

CORE/3519744.0002/160741421.1